O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREDDY E. P.,<br><br>              Plaintiff,<br><br>     v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,[1]<br><br>              Defendant. | Case No. 5:17-cv-8913-KES<br><br>MEMORANDUM OPINION AND<br>ORDER |

# I.

# BACKGROUND

In 2013, Freddy E. P. ("Plaintiff") filed an application for disability
insurance benefits ("DIB") alleging a disability onset date of August 29, 2012,
when he was 38 years old.  Administrative Record ("AR") 87-88, 198.

On May 18, 2016, an Administrative Law Judge ("ALJ") conducted a
hearing at which Plaintiff, who was represented by counsel, appeared and testified,
as did a vocational expert ("VE").  AR 55-85.  On June 9, 2016, the ALJ issued a

---

[1] Effective November 17, 2017, Ms. Berryhill's new title is "Deputy
Commissioner for Operations, performing the duties and functions not reserved to
the Commissioner of Social Security."

decision denying Plaintiff's application.  AR 28-49.  The ALJ found that Plaintiff suffered from the medically determinable impairments of "degenerative disc disease of the cervical and lumbar spine; shoulder strain/sprain status post injury." AR 30.  Despite these impairments, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a limited range of light work "with the ability to lift/carry 20 pounds occasionally and 10 pounds frequently [and to] walk/stand/sit 6 hours in an 8 hour workday," and with limitations on pushing, pulling, overhead reaching, handling, fingering, and postural activities.  AR 32.

Based on this RFC and the VE's testimony, the ALJ determined that Plaintiff could not do his past relevant work as a carpenter, which is described in the Dictionary of Occupational Titles ("DOT") as medium work.  AR 47.  The ALJ found, however, that Plaintiff could work as a cafeteria attendant (DOT 311.677-010), a housekeeping cleaner (DOT 323.687-014), a production assembler (DOT 706.687-010), or an inspector/hand packager (DOT 559.687-074) (collectively, the "Alternative Jobs").  AR 48.  The ALJ concluded that Plaintiff was not disabled. AR 49.

## II.

## STANDARD OF REVIEW

A district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free from legal error and are supported by substantial evidence based on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla, but less than a preponderance.  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Comm'r of SSA, 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the

reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

"A decision of the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). Generally, an error is harmless if it either "occurred during a procedure or step the ALJ was not required to perform," or if it "was inconsequential to the ultimate nondisability determination." Stout v. Comm'r of SSA, 454 F.3d 1050, 1055 (9th Cir. 2006). Plaintiff bears the burden of establishing that the ALJ's decision is based on prejudicial legal error. Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (court may not reverse absent a harmful error, and plaintiff bears burden of establishing that an error is harmful).

### III.

### ISSUES PRESENTED

Issue One: Whether the ALJ erred in evaluating the medical opinions. Plaintiff contends that the ALJ failed to give specific, legitimate reasons for discounting the opinions of Drs. Rubanenko, Tepper, Ainbinder, and Bahk, all of whom treated Plaintiff in connection with his workers' compensation claim. (Dkt. 27, Joint Stipulation ["JS"] at 3, 8.)

Issue Two: Whether the ALJ erred in evaluating Plaintiff's subjective symptom testimony. (JS at 3, 21.)

Issue Three: Whether the ALJ erred in determining Plaintiff's RFC. (JS at 3, 33.) Plaintiff contends that because of errors related to Issues One and Two, the RFC overstates his abilities. (JS at 34.)

Issue Four: Whether the ALJ erred in the vocational analysis. (JS at 3, 39.) Plaintiff contends that because the ALJ erred in formulating his RFC, the ALJ

posed a hypothetical question to the VE that did not reflect all his limitations.  (JS at 40.)  Plaintiff also contends that working as a cafeteria attendant or a housekeeping cleaner would require reaching inconsistent with his RFC.  (Id.)

**IV.**

**DISCUSSION**

**A. ISSUE ONE: The ALJ's Evaluation of the Medical Evidence.**

**1. Rules for Weighing Conflicting Medical Opinions.**

The medical opinion of a claimant's treating physician is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. § 404.1527(c)(2).  When a treating physician's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician.  Id. § 404.1527(c)(2)-(6).  Supportability means that the "more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."  Id. § 404.1527(c)(3).  Consistency means that generally, "the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."  Id. § 404.1527(c)(4).

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence."  Ryan v. Comm'r of SSA, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005)).  "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence."  Id. (quoting Bayliss, 427 F.3d

at 1216); see also Reddick, 157 F.3d at 725 ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (quoting Cotton v. Bowen, 799 F.2d 1403, 1408 (9th Cir. 1986)).

### 2. Summary of Relevant History and Medical Treatment.

Plaintiff worked as a carpenter from 1994 until 2012. AR 247. In 2011, he sought treatment at Kaiser Permanente ("Kaiser") for neck and arm pain. AR 307. He told Kaiser that his right shoulder pain started 15 years ago after an injury,[2] and his left shoulder pain started in 2001 with "no antecedent injury." AR 308. A May 2011 MRI of his cervical spine revealed mild degenerative disc disease. AR 309. Kaiser recommended a cervical epidural steroid injection, which Plaintiff received in October 2011; it brought "mild improvement." AR 310, 333, 370.

At a follow-up appointment for arm and hand pain, Plaintiff reported that he did 80 minutes of moderate to strenuous exercise per week. AR 333. Kaiser adjusted his medications. AR 335.

In July 2012, he reported "right shoulder pain x few years" and "bilateral arm numbness x 2004." AR 368. Per Kaiser's physical examination, Plaintiff had a supple neck, normal muscle tone, normal gait, and motor strength rated 5/5. AR 371. He was still able to exercise 90 minutes per week at a moderate to strenuous level. AR 372.

On August 29, 2012, Plaintiff was injured at work while carrying a tabletop

---

[2] Plaintiff told chiropractor Majzel, his first primary treating source for his workers' compensation claim, that he had suffered industrial injuries to his right shoulder in 1995 and 2003. AR 515-16.

5

with a co-worker. AR 61-62. He told the ALJ that he did not return to work after the day he was injured.[3] AR 62. At a September 5, 2012 Kaiser visit, he reported right-side shoulder pain from an injury at work that "hurts more at night." AR 380. He was prescribed Naprosyn to take "as needed" for pain and scheduled to return in two months. AR 385.

Rather than returning to Kaiser, he next received treatment in connection with his workers' compensation claim from chiropractor Maciej Majzel and orthopedic surgeon Gil Tepper. AR 408, 475. Dr. Majzel ordered several MRIs and other tests to assess Plaintiff's condition. AR 531. In November 2012, Plaintiff underwent a "normal" MRI of the lumbosacral spine, while his October 2012 cervical MRI revealed some disc protrusions and "mild to moderate" stenosis at the C6-C7 level. AR 391, 393. An October 2012 MRI of his right shoulder revealed a partial rotator cuff tear and fluid consistent with bursitis, but no atrophy, while an MRI of his left shoulder also showed bursitis and "mild to moderate" changes in the acromioclavicular joint. AR 397, 400.

In September 2012, Dr. Majzel's initial report noted four different industrial injuries suffered by Plaintiff. AR 515-16. He also noted that Plaintiff had been treating at Kaiser since 2006 due to work-related neck, back, and shoulder pain,

---

[3] In October 2013, Plaintiff told psychiatric consultative examiner Dr. Goldsmith that he stopped working in September 2012 "because of weakness in his arms and was laid off." AR 572. He told consultative examining physician Dr. Yu that he worked until September 4, 2012. AR 582. During a workers' compensation medical evaluation, he told Dr. Ainbinder that after the August 29, 2012 (Wednesday) injury, he told his employer he could not work on August 30 or 31, but he reported for work after the holiday weekend on September 4; his employer told him that he should not be there if he was unable to work and sent him home. AR 666. He told latest treating physician Dr. Rubanenko that he completed his shift on August 29, 2012, and after a night at home, he "continued regular work duties," but his pain increased, prompting him to visit Kaiser on September 4, 2012. AR 835.

but in the same report he stated, "Prior to the industrial injury, the patient was not symptomatic in any of the relevant body parts ...." AR 514, 517. Plaintiff told Dr. Majzel that his knee pain was as significant as his back and shoulder pain. AR 520-21. Dr. Majzel, however, observed Plaintiff had a full range of motion in his knees, all knee tests were negative, and Plaintiff could walk on his heels and toes. AR 524, 528-29. For Plaintiff's upper body, Dr. Majzel observed a reduced range of motion in everything he measured except Plaintiff's wrists and elbows. AR 522-26. He opined that Plaintiff's right arm displayed atrophy and assessed motor strength of 4/5 for that arm. AR 527.

In January and February 2013, Dr. Tepper authored reports. AR 549, 554. Dr. Tepper reviewed the MRIs and saw "significant stenosis" of the cervical spine, making Plaintiff a good candidate for cervical spinal fusion surgery.[4] AR 550-51. Dr. Tepper found muscle weakness in Plaintiff's *left* arm and shoulder, but not in his right – contrary to Plaintiff's original reports to Kaiser (AR 380) and Dr. Majzel (AR 516).[5] AR 559.

On July 22, 2013, Dr. Tepper referred Plaintiff back to his primary physician "to continue with conservative care," because the proposed cervical fusion surgery was not authorized. AR 567. He repeated his assessment that Plaintiff's right upper-extremity motor strength was 5/5.[6] Id.

---

[4] Plaintiff refused this surgery because his doctors were "just not offering [him] a good outcome." AR 66.

[5] Consultative examiner Dr. Yu agreed that "mild" abnormalities affecting Plaintiff's cervical spine appeared "predominantly left-sided" based on the MRI. AR 581. In September 2012 (before the relevant MRI), Dr. Majzel opined that Plaintiff's *right* arm displayed atrophy, and he assessed reduced motor strength of 4/5 for that arm. AR 527.

[6] A few months later, in October 2013, Plaintiff told the psychiatric evaluator, Dr. Goldsmith, that immediately after his injury at work, he could no longer use his *right* arm effectively. AR 571.

7

Orthopedist Dr. Rubanenko became Plaintiff's primary physician in January 2013. AR 408, 667. Like chiropractor Majzel, Dr. Rubanenko found tenderness everywhere Plaintiff complained of pain, even his knees. AR 409. Dr. Rubanenko listed 20 conditions as diagnostic impressions, including "bilateral knee strain/sprain." AR 410. He prescribed physical therapy ("PT"), shockwave treatment, and topical and oral pain medication. Id.

By April 2013, Plaintiff reported that his pain had decreased from 10/10 to 6/10. AR 447. In August 2013, he had pain rated 7/10 in his upper extremities and 4/10 in his knees "which has increased from 3/10 on last visit."[7] AR 436-37. Plaintiff testified that Dr. Rubanenko recommended *left* shoulder surgery, but Plaintiff was unwilling to undergo the procedure because the doctors could not "guarantee" him anything and his mother had died due to "medical negligence." AR 71-72.

In April 2014, Plaintiff saw Dr. Dennis Ainbinder for a workers' compensation medical evaluation. AR 664-94. Dr. Ainbinder assessed work restrictions that precluded Plaintiff from four things: (1) "repetitive cervical motion," (2) "prolonged overhead activities," (3) lifting more than 50 pounds, and (4) "repeated bending and stooping." AR 691. He recommended over-the-counter pain medication, heat packs, and home exercise. AR 692. In August 2014, Dr. Ainbinder issued a report finding that Plaintiff's back-related impairments were not entirely industrial. AR 604-50; see also AR 684-88 [April/May 2014 report].

On June 13, 2014, Dr. Rubanenko issued a permanent and stationary report opining that Plaintiff had reached maximum medical improvement. AR 834-66. In that report, Dr. Rubanenko listed the numerous other doctors who had treated Plaintiff. AR 854-57. He summarized Plaintiff's responses to a pain questionnaire

---

[7] In his September 2013 Adult Function Report, Plaintiff claimed pain in his arms, neck, lower back, and hands. AR 259. He did not mention his knees.

and noted that Plaintiff reported being "able to perform most household activities." AR 838; see also AR 847-48 (only "mild" difficulty with chores such as cooking or dusting).[8] Plaintiff also reported that he could "hardly drive at all because of severe pain in his neck."[9] AR 840. Plaintiff reported that "pain prevents him from walking more than one mile."[10] AR 842. Plaintiff reported that he can "rarely" straighten or bend his leg fully, and knee pain impedes his performance of numerous activities, including combing his hair, using a telephone, and opening jars. AR 847-48. Dr. Rubanenko observed Plaintiff had a full range of motion in his knees (AR 853) and listed no objective findings about Plaintiffs knees (AR 862-63), but he nevertheless diagnosed Plaintiff with "[b]ilateral knee strain/sprain." AR 857. Dr. Rubanenko also diagnosed Plaintiff with "[d]epression/anxiety."[11] Id.

---

[8] In his Adult Function Report, Plaintiff claimed that his wife helps him do everything, even dress, bathe, and feed himself, because he has trouble holding silverware. AR 260. He does not cook because he cannot hold things in his hands. AR 261. When asked to list household chore he could do despite his impairments, his listed none, stating instead, "My wife do for me or my son." Id. At the hearing, Plaintiff testified that he was not able to be helpful around the house by doing light chores such as fixing things or taking out the trash. AR 67-68.

[9] In his Adult Function Report, Plaintiff noted that he drives because his wife cannot drive; he drives her to the store "not every day" for shopping. AR 262. He also goes to his parents' house, church, and the park. AR 263. He drove to the hearing. AR 67.

[10] In his Adult Function Report, Plaintiff claimed that he could only walk three blocks. AR 264. At the hearing, he testified that he could walk one block. AR 73.

[11] In October 2013, Plaintiff told the psychiatric evaluator, Dr. Goldsmith, that "but for his physical problems, he could function in the workplace," and Dr. Goldsmith found Plaintiff suffered from no "disabling psychiatric symptoms." AR 571, 574. Plaintiff reported being able to drive, handle money, read, visit with family, attend church, follow instructions, get along with others, and manage his own schedule for medication and medical appointments. AR 262-65.

Dr. Rubanenko opined that Plaintiff could return to his usual occupation (i.e., carpentry) if restricted against (1) "prolonged activities of overhead looking, flexion/extension of the head/neck, bending the neck, overhead work, exposure to loud sounds and exposure to bright lights," (2) "repetitive work at or above shoulder level," (3) carrying more than 5 pounds, (4) pushing or pulling more than 25 pounds, (5) more than "occasional" stooping, twisting, reaching, handling, and fingering,[12] and (6) exposure to "vibrations" and "heights, machinery, temperature extremes, dust, fumes, [and] humidity." AR 863-64.

In October and November 2014, Plaintiff saw Dr. Bahk, an orthopedic surgeon, who opined that Plaintiff's shoulder pain was originating from his neck and recommended consultation with a neck specialist. AR 708.

In May 2015, Dr. Rubanenko recommend that Plaintiff undergo *right* shoulder surgery to repair a rotator cuff tear. AR 802.

**3. The ALJ's Evaluation of Drs. Rubanenko, Tepper, Ainbinder, and Bahk.**

The ALJ provided a chronological summary of the medical evidence. AR 33-45. The ALJ found that the "conclusions, observations and findings" made by the medical sources who treated Plaintiff in connection with his workers' compensation claim were of "limited probative value" for several reasons. AR 45. First, the ALJ noted that these medical sources had given opinions, in part, about whether Plaintiff was disabled for purposes of workers' compensation benefits, and such opinions are not binding on ALJs determining eligibility for DIB. Id. Second, the ALJ noted that these sources' opinions of what work restrictions would enable Plaintiff to return to work as a carpenter did not address under what conditions Plaintiff could sustain *other* competitive work – the relevant question at

---

[12] Dr. Rubanenko expressly imposed no restrictions on "climbing, balancing, kneeling, crouching, crawling, feeling, seeing, hearing, and speaking." AR 864.

step five of the sequential evaluation process for DIB applications. Id. Finally, the ALJ noted that some of these opinions relied on different criteria than those used to determine disability for purposes of DIB. Id. The ALJ therefore gave the opinions of Drs. Rubanenko, Tepper, Ainbinder, and Bahk "limited weight." Id.

The ALJ gave "substantial weight" to the report of consultative examiner, Dr. Warren Yu, finding that it was more consistent with the objective medical evidence, including "multiple imaging scans and clinical findings," than the opinions of the workers' compensation doctors. AR 47, citing AR 581-91 [Dr. Yu Medical Source Statement]. The ALJ also found that Dr. Yu's opinions of Plaintiff's functional abilities were more consistent with Plaintiff's own statements about his daily activities. Id.

Plaintiff contends that the ALJ erred because he did not discuss any of the 20 C.F.R. § 404.1527 factors in explaining why he gave "little" weight to the opinions of Drs. Rubanenko, Tepper, Ainbinder, and Bahk. (JS at 8.) Not so. The ALJ referenced supportability and consistency in explaining why he gave Dr. Yu's opinions more weight. AR 47. The questions on appeal are therefore: (1) whether the ALJ's finding that Drs. Rubanenko, Tepper, Ainbinder, and Bahk's opinions lack supportability and consistency is supported by substantial evidence, and if not (2) whether any error was harmless.

a. Dr. Rubanenko.

Dr. Rubanenko opined that Plaintiff could return to work as a carpenter, but only if restricted from "prolonged activities of overhead looking, flexion/extension[13] of the head/neck, bending the neck, [and] overhead work …." AR 863. It is unclear if Dr. Rubanenko meant for the phrase "prolonged activities"

---

[13] According to the dictionary definitions, "flexion" means bending, while "extension" means moving from a bent position to a straight position. See https://www.merriam-webster.com.

to modify all the activities he listed or just the first one, i.e., overhead looking.  It is also unclear what Dr. Rubanenko meant by "prolonged."  Plaintiff does not discuss the meaning of these restrictions in the Joint Stipulation briefing.

At the hearing, Plaintiff's counsel read Dr. Rubanenko's restrictions to the VE.  AR 84.  The VE asked for clarification of the restriction against flexion or extension of the neck, stating, "So am I understanding this; … there's the preclusion from, pretty much, turning the neck at any level, looking downwards, upwards, sideways?"  Id.  Counsel responded, "Correct."  Id.  The VE opined that this restriction would preclude all work, because "all work requires looking in some direction," either downward, sideways, or overhead.  AR 84-85.

The Court will interpret Dr. Rubanenko's opinion in the manner endorsed by Plaintiff's counsel at the hearing.  Substantial evidence supports the ALJ's finding that this opinion lacks consistency with the overall record; it is inconsistent with Plaintiff's reported activities, such as driving.  AR 47 (discussing how Dr. Yu's opinions were more consistent than the other medical sources' opinions with Plaintiff's testimony about his activities, including driving).  Plaintiff testified that he could drive for up to an hour, which necessarily required looking in some direction for an hour.  AR 67.  When asked, "Are you able to turn and look over your shoulder to the right or to the left when you're in traffic?" Plaintiff responded, "I have to lean forward on the seat and then I have to turn a little bit, and that would help me."  AR 70.  Plaintiff admitted to driving his wife (who cannot drive) for household chores and driving himself to medical appointments.  See footnote 9, above.

The ALJ also found Dr. Rubanenko's reports internally inconsistent.  The ALJ noted, "despite [Plaintiff's] allegations about moderate to severe interference with his ability to perform daily activities and self-care, [Plaintiff] reported primarily 'mild difficulty' in actual functioning and daily living during the week previous to the examination."  AR 40, citing AR 848.  The cited record from Dr.

Rubanenko contains a section labeled "Function and Daily Living," under which it states that Plaintiff experienced only "mild" difficulty the week before the exam when performing numerous daily activities, such as climbing stairs, bending to pick up an item off the floor, shopping, taking his socks on/off, cooking, dusting, and getting in/out of cars. AR 848.

Substantial evidence also supports the ALJ's finding that Dr. Rubanenko's opinions lack supportability. The ALJ commented on how Dr. Rubanenko's permanent and stationary report included a discussion of bilateral knee pain "that somehow moderately interfered with plaintiff's ability to write and turn faucets on and off." AR 40, citing AR 847. As discussed above, Dr. Rubanenko continually found Plaintiff to be suffering from bilateral knee sprain from 2013 (AR 410) to 2015 (AR 801 [2015 report], 857 [2014 report]), despite the lack of any MRIs or abnormal clinical findings showing injury to Plaintiff's knees (see, e.g., AR 529-30, 852-53). These were legally sufficient reasons to give Dr. Yu's opinions more weight than Dr. Rubanenko's.

### b. Dr. Tepper.

The ALJ summarized Plaintiff's appointments with Dr. Tepper, an orthopedic surgeon. AR 36-37, 41-44. Dr. Tepper did not author any opinion concerning Plaintiff's functional capacity. AR 758 (in October 2014, Dr. Tepper opined it was "premature" to form opinions regarding work preclusion). His reports largely contain clinical observations, interpretations of MRIs, records of Plaintiff's subjective complaints, and requests for authorization for surgery. See AR 461-570, 724-66.

Many of his clinical findings reveal no or minimal impairment. See, e.g., AR 559 (negative test results). Other clinical findings support the conclusion that Plaintiff suffers from degenerative disc disease of the cervical and lumbar spine as well as shoulder "strain/sprain," a conclusion that the ALJ accepted (AR 30). See AR 558, 567. In the Joint Stipulation, Plaintiff neither identifies what opinion(s)

13

by Dr. Tepper the ALJ purportedly erroneously discounted nor how those opinions, if accepted, would have been changed the ALJ's RFC determination and, consequently, his "not disabled" determination. Instead, Plaintiff only discusses the inconsistency of Dr. Tepper's opinion with that of Dr. Ainbinder. (JS at 7.) Plaintiff has failed to carry his burden of demonstrating legal error regarding the ALJ's consideration of evidence from Dr. Tepper.

### c. Dr. Ainbinder.

Comparing the work restrictions assessed by Dr. Ainbinder to the ALJ's RFC reveals substantial overlap, as follows:

| RFC (AR 32) | Ainbinder (AR 691) |
|---|---|
| No more than "occasional[]" reaching overhead, bilaterally | No "prolonged overhead activities" |
| Lifting limited to 20 pounds | Lifting limited to 50 pounds |
| No more than "occasional[]" bending and stooping | No "repeated bending and stooping" |

Dr. Ainbinder also restricted Plaintiff against "repetitive cervical motion." AR 691. At least one VE has testified that in California workers' compensation jargon, a restriction against "repetitive" activity equates to the ability to perform the activity occasionally. See Luna v. Astrue, No. EDCV 08-0890 AJW, 2009 U.S. Dist. LEXIS 95155, at *11 (C.D. Cal. Oct. 13, 2009). Some courts outside the Ninth Circuit have found no inconsistency in the determination that claimant cannot perform "repetitive" motion but can perform occupations requiring "frequent" motion. Williams v. Colvin, 2014 U.S. Dist. LEXIS 180961, at *10-13 (W.D. Okla. Dec. 31, 2014) (collecting cases). In an unpublished decision, the Ninth Circuit found that "repetitively" refers to "a *qualitative* characteristic – i.e., *how* one uses his hands [or other body part], or *what type* of motion is required – whereas 'constantly' and 'frequently' seem to describe a *quantitative* characteristic

14

– i.e., *how often* one uses his hands [or other body part] in a certain manner."
Gardner v. Astrue, 257 F. App'x 28, 30 n.5 (9th Cir. 2007) (emphases in original).
Applying this reasoning, "repetitive" neck motion would involve repeatedly
moving one's neck in the same manner during the workday, such as one might do
watching a tennis match.

Plaintiff does not discuss the meaning of Dr. Ainbinder's restriction against
"repetitive cervical motion." Plaintiff does not attempt to explain how working as
a cafeteria attendant or a cleaner would require "repetitive" neck movements.
Plaintiff has not met his burden of showing legal error in the ALJ's treatment of
Dr. Ainbinder's opinions.

d. Dr. Bahk.

Dr. Bahk, an orthopedic surgeon, saw Plaintiff in October 2014 for an initial
consultation. AR 705. He noted that Plaintiff had not received any treatment since
June 2014. AR 706. After an examination of Plaintiff's shoulders and reviewing
spinal and shoulder MRIs (AR 706-07), Dr. Bahk opined that Plaintiff's arm and
shoulder pain was "predominantly coming from his neck," and his treatment
"plan" was to "consult a neck physician." AR 708. Under "work status," Dr. Bahk
did not indicate that Plaintiff had any upper body restrictions; he did not check
boxes to restrict Plaintiff against heavy lifting, forceful pushing/pulling, overhead
work, or repetitive neck movement. Id. Instead, despite not examining Plaintiff's
lower body or any medical imaging for Plaintiff's lower body, the only work
restriction he assessed was for the lower body: "sedentary work only." Id. This is
the opinion that Plaintiff contends that ALJ gave an insufficient reason for
rejecting. (JS at 14.)

Again, the ALJ did not err in concluding that Dr. Yu's opinions had more
supportability and consistency. AR 47. As discussed in the preceding paragraph,
Dr. Bahk's opinion was not supported by the limited evidence available to him.
Furthermore, Dr. Bahk's sole opinion limiting Plaintiff to sedentary work amounts

15

1  to announcing an RFC – a decision reserved to the Commissioner.  20 C.F.R.

2  § 404.1527(d).  The ALJ did not engage in legal error by giving this as a reason to

3  reject Dr. Bahk's unsupported opinion.  AR 45.

4  **B. ISSUE TWO:  Plaintiff's Subjective Symptom Testimony.**

5  **1. Rules for Evaluating Subjective Symptom Testimony.**

6  An ALJ's assessment of symptom severity and claimant credibility is

7  entitled to "great weight."  Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989)

8  (quoting Green v. Heckler, 803 F.2d 528, 532 (9th Cir. 1986)).  "[T]he ALJ is 'not

9  required to believe every allegation of disabling pain, or else disability benefits

10  would be available for the asking, a result plainly contrary to 42 U.S.C.

11  § 423(d)(5)(A).'"  Molina, 674 F.3d at 1112 (quoting Fair v. Bowen, 885 F.2d 597,

12  603 (9th Cir. 1989)).

13  If the ALJ finds testimony as to the severity of a claimant's pain and

14  impairments is unreliable, "the ALJ must make a credibility determination with

15  findings sufficiently specific to permit the court to conclude that the ALJ did not

16  arbitrarily discredit claimant's testimony."  Thomas v. Barnhart, 278 F.3d 947, 958

17  (9th Cir. 2002).  In doing so, the ALJ may consider testimony from physicians

18  "concerning the nature, severity, and effect of the symptoms of which [the

19  claimant] complains."  Id. at 959.  If the ALJ's credibility finding is supported by

20  substantial evidence in the record, courts may not engage in second-guessing.  Id.

21  In evaluating a claimant's subjective symptom testimony, the ALJ engages

22  in a two-step analysis.  Lingenfelter, 504 F.3d at 1035-36.  "First, the ALJ must

23  determine whether the claimant has presented objective medical evidence of an

24  underlying impairment [that] could reasonably be expected to produce the pain or

25  other symptoms alleged."  Id. at 1036.  If so, the ALJ may not reject a claimant's

26  testimony "simply because there is no showing that the impairment can reasonably

27  produce the *degree* of symptom alleged."  Smolen v. Chater, 80 F.3d 1273, 1282

28  (9th Cir. 1996).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); Ghanim v. Colvin, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014).

**2. Summary of Plaintiff's Subjective Symptom Testimony.**

Plaintiff testified that since his workplace injury in August 2012, "I'm not able to do anything." AR 64. Nevertheless, he admitted that he could drive for up to one hour (AR 67) and walk his daughter one block to and from school each day (AR 68). He testified that he could not lift his arms due to pain; he could not put a dish in an overhead cupboard. AR 70. If he picked up something as heavy as a 29-ounce can of beans, he would have "to put it down right away because it causes me pain and numbness on my hand …." AR 73. He could only walk one block before stopping to rest and only stand for one half hour. Id. He needed help to feed himself because he would drop the spoon. AR 260. He did not do any household chores. AR 261. He did, however, drive his wife to stores, visit his parents' house almost every day, go to church and the park twice a month, and go to medical appointments twice a week. AR 242, 262-63. He indicated that his impairments affected his "hearing" and "memory." AR 264. He spent five or more hours per day resting. AR 71.

**3. The ALJ's Reasons for Discounting Plaintiff's Subjective Symptom Testimony.**

The ALJ gave at least the following four reasons for discounting Plaintiff's extreme subjective symptom testimony: (1) inconsistency with the medical evidence, including Dr. Yu's examination, (2) inconsistency with his reported daily activities, (3) Plaintiff's inconsistent statements about the limiting effects of his

pain, and (4) Plaintiff's inconsistent statements about how he was injured.  AR 40, 47.  The Court considers reasons three and four, below, because they are sufficiently clear and convincing reasons, supported by substantial evidence, to discount Plaintiff's subjective symptom testimony.

> a.  <u>Reason Three</u>: Inconsistent Statements About the Limiting Effects of His Pain.

The ALJ noted that in responding to a pain questionnaire from Dr. Rubanenko, Plaintiff reported that his knee pain "somehow moderately interfered with his ability to write and turn faucets on and off."  AR 40, citing AR 847. These questionnaire responses suggest that Plaintiff was not being truthful when he described the limiting effects of his knee pain.

The ALJ also noted that Plaintiff told Dr. Rubanenko that he had only "mild difficulty performing household chores" such as "carrying grocery bags."  <u>Id., citing AR 848.</u>  In contrast, Plaintiff testified at the hearing that he could not do any household chores (AR 67-68, 260-61) and that the heaviest thing he could carry was a 29-ounce can of beans (AR 73).[14]  The inconsistencies cited by the ALJ provide a clear and convincing reason to disbelieve Plaintiff's extreme subjective symptom testimony.

> b.  <u>Reason Four</u>:  Inconsistent Statements About His Injury.

The ALJ noted that Plaintiff initially described his August 29, 2012 injury by saying that he felt immediate pain from his testicles upward.  AR 47.  When questioned about how his testicles were injured, he changed his testimony and stated that he had felt pain from his neck downward.  <u>Id.</u>

The ALJ accurately summarized Plaintiff's inconsistent hearing testimony, which stated in full as follows:

---

[14] 29 ounces is equivalent to about 1.8 pounds.  Even Dr. Rubanenko opined that Plaintiff could lift five pounds.  AR 864.

1  Q: Explain to me exactly what happened to you on that day.

2  A: I was gluing a large bed made out of maple -- I mean strike that --

3  table made out of maple, which was 4 by 12 in length, and then, with

4  another coworker, we lifted it and we carried it approximately 10 feet.

5  And then as we were putting it down, I was not able to continue doing

6  it.

7  Q: Did you have pain?

8  A: Yes.

9  Q: Where was the pain?

10  A: [] I felt it from my testicles, radiating upward.

11  Q: Did you injure your testicles in putting the table down?

12  A: Okay. I felt the pain, but they didn't find anything there, but I did

13  feel the pain around by neck, and it radiated downward.

14  Q: Okay. So the pain you were feeling was from the neck down?

15  A: Yes.

16  AR 61-62.

17      This hearing testimony was not the only inconsistent account that Plaintiff

18  gave of his August 2012 workplace injury:

19      <u>AR 307-08, 368</u>: In 2011 and 2012 (before the August 2012 injury), he told

20  Kaiser that he had experienced neck, arm, and shoulder pain for years with no

21  antecedent injury to his left shoulder and a 15-year-old injury to his right shoulder.

22      <u>AR 380</u>: Days after his August 29, 2012 injury, he told Kaiser that he felt

23  right-side shoulder pain that hurts more at night.

24      <u>AR 516</u>: Plaintiff told Dr. Majzel that he "was moving a large dining table

25  top (weighing approximately 175 pounds) with the assistance of one of his co-

26  workers when he suddenly felt an onset of right arm pain and worsening neck,

27  back and right shoulder pain. … [H]e finished his shift …."

28      <u>AR 571</u>: Plaintiff told Dr. Goldsmith that he "hit his head on an object that

he and his coworker were trying to move."

AR 581:  Plaintiff told Dr. Yu that he "injured himself when he had a fall at work on August 29, 2012 injuring his neck and lower back as well as his shoulder particularly on the right side."

AR 599:  Plaintiff told Dr. Zlotolow that "while moving some plywood, he injured his shoulder."

AR 641: Per a deposition summary, Plaintiff testified that on August 29, 2012, he was "putting in a solid wood table top, 4 x 12 feet, on with several metal clamps.  They lifted it and put it on its side to put it up against the wall and [he] remembered after doing that he felt something like a cut on his arm."

AR 666:  Plaintiff told Dr. Ainbinder that "he was lifting a 4x4 maple board weighing approximately 150 pounds with the assistance of a co-worker to put against a wall when the wood tilted, leaving [Plaintiff] with most of the weight. [Plaintiff] felt his neck, lower back, and bilateral shoulder were forcefully pulled and jolted.  He experienced immediate pressure pain in the neck, lower back and shoulders.  He also felt a cramping sensation in the neck radiating down to the back."

AR 701:  In March 2014, Plaintiff completed an "Employee's Disability Questionnaire" about his injury, wherein he wrote, "Pushing a car with materials inside the compart[ment] and when I was pushing I felt with the car the car pass over me.  I got injury in my neck, my right shoulder, low back and middle back."[15]

AR 705: Plaintiff told Dr. Bahk that on August 29, 2012, he "and a coworker lifted and moved a heavy piece of furniture when he experienced a pop in one of

---

[15] Nothing in this 2014 form suggests Plaintiff is describing a 1995 accident, although Plaintiff did report a 1995 accident involving a cart, but with different facts.  See AR 638-39 (he was pushing the cart when it toppled and its contents fell on him; he fell and hit his head); AR 599 (he stopped the cart from rolling down a ramp); AR 515 (he forcefully pushed the cart with his right arm, twisting it).

the shoulders that was followed by sharp burning pain in both shoulders."  He went
to work the following day and again reported the injury to his supervisor.

Thus, Plaintiff's inconsistent hearing testimony cannot be dismissed as
merely a misstatement or translation error.  The ALJ did not commit legal error in
citing Plaintiff's inconsistent hearing testimony about the cause of his injury as a
clear and convincing reason to discount his subjective symptom testimony.

**C**. **ISSUE THREE: The ALJ's RFC Determination.**

Plaintiff argues that the ALJ "did not address all limitations based on the
whole record in his RFC assessment," because he did not credit some medical
opinions or Plaintiff's subjective symptom testimony.  (JS at 34.)  As discussed in
Issues One and Two, the ALJ did not err in discounting that evidence, which
means that the ALJ did not err in declining to incorporate it into Plaintiff's RFC.

**D**. **ISSUE FOUR: The ALJ's Vocational Assessment.**

The RFC limits Plaintiff to "no more than occasionally reach[ing] overhead
bilaterally," but imposes no limits on other forms of reaching.  AR 32.
"Occasionally" means up to one-third of the time.  Social Security Ruling ("SSR")
83-10.  The VE testified that a person with this reaching limitation could work as a
cafeteria attendant, a housekeeping cleaner, a production assembler, or an
inspector/hand packager.  AR 76-78.  Per the DOT, all four Alternative Jobs
require "frequent" reaching, defined as between one-third and two-thirds of the
time.  See DOT 311.677-010, DOT 323.687-014, DOT 706.687-010, and DOT
559.687-074; SSR 83-10.  The VE acknowledged that the DOT does not
distinguish between overhead reaching and other kinds of reaching, so her opinions
about overhead reaching were based on her background and experience.  AR 82.

Citing the DOT, Plaintiff argues that working as a cafeteria attendant would
involve "wiping down tables and seats, cleaning tables, often carry[ing] heavy
trays of food, dishes, and glassware."  (JS at 39-40.)  Plaintiff argues that working
as a housekeeping cleaner involves "carrying linens, making beds, moving

furniture to clean, [and] cleaning floors." (JS at 40.)  Plaintiff does not argue that any of these activities require overhead reaching.  He does not argue that the DOT's exertional ratings for these Alternative Jobs require lifting that exceeds Plaintiff's RFC as determined by the ALJ.

Under Issue Four, Plaintiff also argues that if the ALJ had accepted the medical opinions of Dr. Rubanenko (including a restriction against any "flexion/extension of the head/neck"), then the ALJ would have formulated an RFC that precluded Plaintiff from all work.  (JS at 40, citing AR 863.)  As discussed above, the VE opined that if this restriction meant a "preclusion from … turning the neck at any level, looking downwards, upwards, [or] sideways," then it would preclude all work, because all work requires looking in some direction.  AR 84-85.  As discussed above, the ALJ gave specific, legitimate reasons for discounting Dr. Rubanenko's extreme opinion.

# V.

# CONCLUSION

For the reasons stated above, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner of Social Security and DISMISSING this case with prejudice.

DATED:  <u>January 18, 2019</u>

_Karen E. Scott_
_____
KAREN E. SCOTT
United States Magistrate Judge